[Cite as *In re J.W.*, 2025-Ohio-5031.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: J.W.                         :       APPEAL NO.    C-240566
                                       TRIAL NO.      F/19/875 X

                              :

                                    *JUDGMENT ENTRY*

                              :

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 11/5/2025 per order of the court.**

**By:**_____
          **Administrative Judge**

[Cite as *In re J.W.*, 2025-Ohio-5031.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: J.W. | : | APPEAL NO. | C-240566 |
| | | TRIAL NO. | F/19/875 X |
| | : | | |
| | | *O P I N I O N* | |
| | : | | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 5, 2025

*Stagnaro Hannigan Koop, Co., LPA* and *Michaela M. Stagnaro*, for Appellant Mother,

*Victor Dwayne Sims*, for Appellee Father.

**ZAYAS, Judge.**

{¶1} This appeal concerns a dispute regarding father's parenting-time schedule with J.W. After mother filed a motion to modify a foreign custody-and-parenting-time order from a Virginia court, which was filed with and given "full force and effect" by the juvenile court, the juvenile court entered an order providing that father would ultimately have "equal sharing of parenting time." Mother now appeals from that order, raising three assignments of error. The first assignment of error challenges the juvenile court's best-interest determination regarding the parenting-time order. The remaining assignments of error present procedural and evidentiary challenges to father's testimony about prior violence by mother.

{¶2} As explained more fully below, we overrule the first assignment of error as the juvenile court adopted mother's proposed shared parenting plan with certain modifications "to support the best interest of the Child" under R.C. 3109.04(E)(2)(b), and the juvenile court's findings regarding J.W.'s adjustment to father's home, father's ability to accommodate a "2-2-5-5" schedule, father's increased participation in J.W.'s life during the pendency of the proceedings, and father's willingness to communicate with mother were all supported by competent, credible evidence. We further overrule the second and third assignments of error as the juvenile did not abuse its discretion in admitting evidence of mother's prior violence or by allowing father to further testify in response to mother's testimony and to present new information. Therefore, we affirm the judgment of the juvenile court.

## I. Pretrial Proceedings

{¶3} In July 2019, mother filed a request in the juvenile court to register a foreign child-custody determination from the Virginia Juvenile and Domestic Relations District Court of Fairfax ("the Virginia court") regarding custody of J.W. The

order attached from the Virginia court, entered in January 2019, indicates that father filed a petition for custody and visitation in Virginia and that the parties thereafter entered into a "Consent Order" with respect to custody and parenting time/visitation, which the Virginia court "entered" upon a finding that the agreed order was "proper and in the best interest of the Minor Child." In section 2 of the order, entitled "Legal Custody," the agreement provided that the parties would have "joint legal custody" of J.W., "with mother having the final-decision making authority on medical decisions," subject to certain included stipulations on decisions pertaining to religion, education, and medical. In section 3 of the order, entitled "Physical Custody (Custodial and Parenting Time)," the agreement provided that J.W. would "primarily reside with mother," with father having limited parenting time of "at least" once per month, with the possibility of additional visits upon written agreement and at least two weeks' notice.

{¶4} Shortly after mother's request to register the order, the magistrate entered an order under R.C. 3127.35 giving "full force and effect" to the Virginia court's order ("the Virginia order").

{¶5} In October 2019, father filed a motion under R.C. 3109.051 to modify the parenting time set forth in the Virginia order. The motion was brief and simply stated,

> Father submits that a change of circumstances has occurred since the Consent Agreement was signed and it is in the best interest of his son, [J.W.], to modify the prior order. Wherefore, Father requests a hearing to more fully address the reasons for the modification of parenting time.

{¶6} Father simultaneously filed a notice—pursuant to the terms of the

4

Virgina order—informing mother of his intent to relocate to Athens, Ohio "in the immediate future where he has obtained employment."

{¶7} In January 2020, the magistrate referred the matter to mediation. The following month, in February 2020, the juvenile court "accepted and approved and incorporated" the parenting-time agreement reached by the parties in mediation, which incorporated the Virginia order. The agreement modified the holiday schedule and, specific to parenting time, provided,

> Because of father's work and sports schedule, the parents agree to be flexible with parenting time. The parents agree to be flexible with each other and talk to each other about time. If they cannot agree on a specific time they will follow the Virginia Schedule.

{¶8} In October 2022, mother filed a motion to modify the "parenting schedule and other provisions" of the Virginia order. The motion acknowledged the February 2020 agreement but asserted that such order only modified the holiday parenting time and "accepted and incorporated the remainder of the Virginia parenting time order." The motion further stated,

> The current Order provides no set regular parenting time schedule, which has caused conflict between the parents. Additionally, Father now lives in much closer proximity to Mother making frequent and consistent visits possible. Mother states that she and Father had some discussions regarding modification to the parenting schedule and other provisions of their parenting order but have been unable to reach a full agreement and reduce that to writing. Mother requested co-parenting counseling but Father has not been willing to attend. Due to Father's lack of cooperation, Mother is respectfully requesting a trial

5

date so that the court may determine what modifications are in the child's best interest.

Mother believes that modifications to the [Virginia order] are in the minor child's best interest. Mother respectfully requests that the Court adopt a Shared Parenting Plan with her requested changes.

{¶9} In January 2023, mother filed a proposed shared parenting plan. Relevant here, the proposed plan set forth that the parents "agree to share the physical and legal care of their minor child," and requested a parenting-time schedule wherein father would have J.W. on the weekend—from Friday afternoon through Sunday evening–during week one and on Wednesday afternoon during week two.

{¶10} In February 2023, the magistrate entered an interim order that father's parenting time would be as set forth in mother's proposed shared parenting plan until further order of the court.

{¶11} After the parties were unable to reach an agreement, a guardian ad litem ("GAL") was appointed, and the matter was set for trial in October 2023.

{¶12} Prior to trial, mother filed an amended proposed shared parenting plan in August 2023. This amended plan now proposed that father would have parenting time every Wednesday from either 12:00 p.m. or after school until 7:00 p.m., and every other weekend from Friday at 12:00 p.m. or after school through 5:00 p.m. on Sunday.

{¶13} The matter proceeded to trial on October 13, 2023, and January 23, 2024.

## II. The GAL Report

{¶14} The GAL report, filed prior to trial, identified the "presenting issues" as a dispute over whether father should have equal parenting time. It indicated that father was seeking equal parenting time and had moved to Cincinnati in order to be

6

able to spend more time with J.W. On the other hand, it indicated that mother was concerned that J.W. was not ready to spend equal parenting time with father and questioned father's motives in seeking equal time based on his history of exercising parenting time. After conducting an investigation, the GAL recommended shared parenting with mother being designated as the residential parent, and a phase-in schedule towards equal parenting time with father. The GAL additionally recommended that father needed to be more supportive of J.W.'s activities and medical needs and needed to be more involved in J.W.'s life, and that mother may benefit from a parenting program to learn different methods of discipline.

### III. The Trial

{¶15} At the start of the October hearing, the parties informed the court that "all parties agree to shared parenting, but we're just litigating what the actual time will look like."

{¶16} Mother then began her case presentation by cross-examining father. Father agreed that, when he was living in Virginia, he was seeing J.W. about once a month. However, he testified that he moved to Athens, Ohio in December 2019, and started having J.W. on a week on/week off rotation from March until June 2020, during Covid when the daycare centers were closed. But once the daycare centers reopened, he said mother "withdrew that additional parenting time in order for [J.W.] to use daycare instead of spending time with his dad." When questioned if mother's assertion of his parenting time during this period (which shows him as exercising parenting time March 23 to 28, April 5 to 10, April 26 to May 3, May 23 to May 30, and June 5 to June 10) was correct, he answered that he could not recall and would need to look at his text messages and "things like that" to confirm. When asked about his parenting time after that, he said he exercised his extended summer visits and

attempted to give notice to mother for additional visits beyond one weekend per month, but mother would say that ten or twelve days was not sufficient notice. When asked if agreed that he did not exercise his holiday time after the February 2020 agreement was reached in mediation, he answered, "I mean (inaudible) maybe Thanksgiving or Christmas. I have not, but other holidays, you know, they kind of over run with the scheduled visitation I have." Father was then asked about specific holidays in 2020, 2021, and 2022 and whether he exercised his parenting time those days, and he mostly answered that he could not recall but seemed to concede that he missed major holidays like Thanksgiving and Christmas.

{¶17} He testified that he has "never done a Christmas" with J.W. When asked why not, he said he has "a lot of trepidation communicating with [mother]." He stated, "She gives me a lot of anxiety to talk to her. She's very violent. She's physically violent with me. She's hit me in the past. And it's hard to have these conversations[.]" When asked if mother has hit him since the Virginia order, he answered, "She has hit me numerous times throughout our relationship." When asked if mother hit him after J.W. was born, he replied, "After – I believe so, yes. In 2018, yes." When asked to confirm that his testimony was that he missed holiday visits because he has anxiety about communicating with mother, he answered, "Because I would have to – when its known weekends and known visitation, all I have to do it go pick [J.W.] up from school." He continued, "I don't have to set up a time to reach – meet [mother] anywhere or do anything of that nature." When asked if he agreed that he was choosing not to exercise his holiday time even though the holiday schedule includes set times for visitation, he said, "It's easier to pick him up from school where she's not at and not involved and I don't have to see her."

{¶18} When asked about his denial of weekly Wednesday parenting time

instead of every other Wednesday, he appeared to claim that his academic schedule did not allow him to shift to every Wednesday without advance notice. He said, "We're on semesters. My schedule is set six months in advance. She offered something in the middle of a semester. I cannot just change and adjust my schedule based on these offers." He testified that he can "make adjustments with advance notice." He agreed that he did not have classes on Wednesdays during the relevant time, but said his job "is more than classes, though." He ultimately said, "If I know that I can get my child and have access to my child in advance, I can set a schedule around that to make sure I have the ability to get my child."

{¶19} Father was asked about his assertions to the GAL—outlined in her report—that mother was violent toward J.W. When asked if he ever personally observed mother being physically violent toward J.W., he answered, "Directly physically? I have not watched her hit him directly, no. I have watched her correct him (inaudible)." He denied ever discussing his concern with mother or contacting children's protective services. When asked what family members mother has been violent towards, he answered, "She's been violent towards her sister and her (inaudible)." He denied seeing this himself, but said, "She's told me that, though."

{¶20} When asked about what parenting time father wanted, he said he is open to a variety of schedules but just wants equal time. When asked if he agreed that equal time was a "pretty drastic change" in parenting time, he said, "Sure. I would agree. That's why we requested a graduated change." When asked if he agreed that J.W. typically has a "tough time" with having more than three overnights with him, he replied, "No, I would not agree with that."

{¶21} At the conclusion of mother's cross-examination of father, the court asked father's counsel how he wanted to handle father's direct examination. Counsel

9

replied, "I think I'll just do it – I'll just do it now – is that okay?" The court agreed, and father then presented his direct testimony.

{¶22} Father testified that he is employed as a senior professor at Northern Kentucky University. He said this "entails teaching classes, doing research, community school, national service for different organizations." He continued, "I'm a (inaudible) some of those organizations, on the board for a national organization. I'm also the internship coordinator for our department, the undergraduate chair and the graduate chair (inaudible) department as well, and I have (inaudible) performance lab director (inaudible)." He testified that he has "some discretion with [his] scheduling, and when [he] can go in, [he goes] in." His classes are scheduled six months in advance. Once classes are scheduled, then faculty meetings, staff meetings, and "things like that" are scheduled around the class times. Then, once those are set, he sets office hours for students to stop by and then other things after that.[1] When asked if his schedule was "flexible enough" to take J.W. to school and pick him up, he answered, "Yeah, that wouldn't be a problem." He said, "I made [the schedule] now already in case that does happen," in the event that mother goes out of town or something else happens. He testified that he does not have any classes before 9:30 a.m. or after 2:40 p.m.

{¶23} When questioned about compliance with holiday time, he agreed that he understood he would have to do what was ordered by the court. When asked if he was "going to take it" if he was given every other Christmas, he answered, "Yes, very much so. Very much so." Referring to the claimed difficulty interacting with mother, he said,

---

[1] The transcript has six inaudible notations during his discussion of the other things, but what is available suggests something to do with research, speaking, serving, and other meetings.

This was a big step for me, just to confront this and get it out and talk about it.

Like I said, it's been hard. You know, it's affected my life in so many ways, trying to overcome and be able to deal with her and communicate with her.

You know, so it's – somebody told me I've just got to confront it. I've got to talk about it and stop holding it to the chest.

And it doesn't make me less of a man for it, and that -- you know.

And so -- so I just had to go ahead and get it out. And I think this is a big step for me just to move forward.

{¶24} At the conclusion of father's direct testimony, mother then called the GAL to testify. When asked if she had any concerns about father not exercising his parenting time, she agreed that she did and said, in her experience, if you really want to be there for your child, you will make the time and do what it takes to get that time. She added, "And it was just concerning that [J.W.] had all these medical appointments with a kidney issue that dad did not attend. [J.W.] (inaudible) very articulate, bright boy, full of personality. I think he (inaudible) a little disappointed that dad didn't (inaudible)." When asked whether mother supports father being a part of the child's life, she answered, "I think mother has tried very hard. I don't -- again in doing this line of work, we don't -- you normally don't see a mother communicating -- or, a parent communicating times once you're court involved. But mother -- there were records that showed that mother was keeping dad informed of (inaudible) plans, hospital appointments, doctor's appointments, everything (inaudible)."

{¶25} When asked whether, as a part of her investigation, she had any concerns of mother being violent towards the child, she answered, "No. I talked to

[J.W.] about (inaudible) both homes, and he told me -- he told me mother was spanking (inaudible), but nothing that I think would cause real concern." She denied speaking to mother about father's allegations. She said she believed she talked to mother about discipline, but the conversation was nothing memorable. When asked if she had any concerns about mother's ability to parent or J.W.'s safety in mother's home, she answered, "Not at all. She's very protective. She's very concerned about him being exposed to the process." When asked about her recommendation for mother to take classes on discipline, she suggested that the recommendation was because it would be helpful to address father's concerns. She clarified, "I'm not saying that mother needs to or should take those classes. I'm just saying that she may benefit." She testified that parents have a right to "discipline their child as they feel fit, and you know – you know, I respect that. And I don't see anything that, in talking with [J.W.] that it was out of the ordinary." Regarding parenting time, she testified that she spoke with J.W. and he "wants to maintain the current schedule."

{¶26} When asked about her comment in her report that J.W. appeared more comfortable in mother's home, she indicated that there may have been other factors contributing to this finding. First, she said that she was meeting J.W. for the first time at father's home, so she was a "stranger" to J.W. at the time. Whereas she was not a stranger when she met with J.W. at mother's home. Further, father had some people— friends and/or cousins—over at his house that she believed "affected (inaudible)." Further, at mother's house, J.W. had two neighborhood friends over and so J.W. "was funny and he was happy and he was (inaudible)."

{¶27} When asked about her recommendation that mother be designated the residential parent, she indicated that this was because of mother's history of being the parent to make appointments, ensuring J.W. has a tutor for school, taking J.W. to

12

school, and signing him up for activities. When asked about her parenting-time recommendation, she indicated that she recommended a phase-in schedule without a "specific schedule" because "a lot of it is going to depend on [J.W.]'s comfort level." She was then asked if she recommended check-ins with J.W. when it comes to changes in the schedule, and she agreed this was her recommendation. She said, "I think [J.W.] -- he certainly would be very vocal about it to mom. I don't know about with dad, because I don't think he wants to hurt his dad's feelings. You know, I -- he -- I think he loves his dad. He wants to be with his dad, but I just don't think he's quite there yet, to feel that comfortable." She denied that an "equal parenting-time schedule" was in J.W. interest "right now," and said, "I think if dad would become more involved with his activities, I think that would make a huge difference for [J.W.]." She indicated that she did not feel that father "prioritized [J.W.] like he could have," and "gets caught up in other things." She said, "[J.W.]'s very cognizant that his dad does not attend his -- his activities. And so I think he interprets that in a way that makes him cautious."

{¶28} At the second hearing, the GAL denied having any concerns for J.W. at either parent's home. When again asked at the second hearing about J.W.'s wishes, she answered, "He wants to visit with his dad. He wanted to keep it at the time -- if I recall correctly -- what the visitation schedule was at that time. He said he would like to expand it, but he wasn't ready at that time." She denied meeting with J.W. since she filed her report. When asked if she spoke with anyone else who could tell her about J.W. during the course of her investigation, she replied, "I may have (inaudible) collateral calls, but there was nothing really either way. I mean, it's one of those situations where both parents are more than appropriate. The kid is doing well. And there's just some communication issues, I think (inaudible)." When ultimately asked for her recommendation for the family, she responded,

13

A shared-parenting plan.  I think the parents -- both of them, I think -- this -- usually these cases are like two bad parents and you try to figure out which one is not as bad.

In this I think there are two parents that are very capable and doing very well, and have the child's best interest at heart.

I -- the only concern I did have was dad was not – had opportunities to spend some time with [J.W.] in which he didn't take (inaudible).

And that -- you know, that was a concern, but (inaudible) it's not a major concern, no.  But if he wants to be that involved in his life (inaudible).

{¶29}  When asked if she believed that equal parenting time was in J.W.'s best interest, she replied, "when he's ready, yeah."  She agreed that she recommended a phase-in schedule.

{¶30}  Mother testified that father does not attend J.W.'s activities.  She said, "So, you know, [father] is not involved.  He does not come.  He does not support actively, I would say, very much on his time."  However, she indicated that father does come to activities during his parenting time.  Further, she said that, since the first hearing, father "did come to some things that he has not ever attended before."  She indicated that father attended a parent-teacher conference and a volunteer and/or field-trip-type event.  Regarding activities, she said father does not come to practices and only comes to games "when it's on his day."  Further, she indicated that father brings J.W. late to his activities.  She testified, "He constantly, consistently brings [J.W.] late to his activities when he has him, does not show up to his activities when he does not have him.  And it's -- it's unfortunate for [J.W.]."  She mentioned one time

14

"after [they] had trial" where father was 30 minutes late with J.W. to J.W.'s championship game. She also indicated that father was late with J.W. for a medical appointment once. She further indicated father was eight minutes late with J.W. for one session with J.W.'s tutor. She claimed father has "a constant lack of respect for others' time, but really for [J.W.], you know."

**{¶31}** When asked whether she felt that father has exercised his parenting time under the current orders, she said, "He has not." When asked why not, she answered, "I'm – I'm not sure. I mean, he just doesn't take advantage of the time." She continued, "There's never been a time, you know, that he has asked for time in advance and I've just said no. Right? So he just doesn't take the time that he's allotted. He's canceled." When testifying specifically as to parenting time in the past, mother testified that father had 31 overnights with J.W. in 2021 and 37 overnights in 2022.

**{¶32}** When asked if she felt a schedule with alternating seven-to-ten-day visitation was best for J.W., she denied that it was and said,

> I mean, our -- our son does not enjoy being away from his home, his primary home, our home, not long. And father knows that. Father has taken our son from (inaudible) home to my house, because our son has asked to come home. I have text messages of that. So he -- he knows that I don't think -- our -- our son is not used to being away that long and does not care to be away that long. And so I do not feel like that's the best interest of our child and -- yeah.

She further indicated that she did not feel that doing "that long of a period" was necessary since they live in the same town now.

**{¶33}** Mother was asked about father's allegations that she was violent. She denied ever being violent with J.W. or using physical punishment. She indicated that

15

father was lying and said that father requested a GAL "just to demean [her], say nasty things and just attack [her] character as a mother and literally make up lies."

{¶34} When asked why she filed the motion to modify father's time, she indicated that there was constant contention between the two of them because of the two-week notice requirement under the Virginia order. She said, "So our order from Virginia says two weeks['] notice. Those 14 days turn into ten days, to nine days, sometimes six days['] notice. And it was just constant, you know, contention. And it's just a lot of emails and a lot of communication, and we do not communicate well." She filed the motion after they were unable to reach an agreement on a more consistent schedule. She said, "So I was just trying to get some like consistency for our child and consistency for both of us, too, so that we wouldn't have to message each other and communicate as much." Mother testified that she was opposed to an equal schedule, and said, "I don't think it's in the best interest of our son. And he doesn't want it. He's – he's communicated that to everyone." When asked about the new interim schedule—where father has J.W. every other Wednesday and every other weekend—and how J.W. has adjusted, she answered,

> I think -- I think now he's okay with like keeping it the way it is.
>
> It was new for him, and it took a little bit of time, but I think he's like at the point where, you know, if you tell him he's going to his dad, he kind of gets it -- right? -- but he still is like, Well, how long, and it's like just, you know, Two days, and he's like, Okay.
>
> So I think telling him it's short, you know, he -- he is adjusted, because he's smart, we're communicating with him, and he knows that he's going to come back to the house in two days -- right? He's going to come back to the house in a day.

16

So he – he's there.  He doesn't want it to change.  He doesn't want – he's not ever asked for more time with his father.

**{¶35}** She testified that she felt a "regular" parenting-time schedule was in J.W.'s best interest because father "has never really spent more than, you know, ten percent of [J.W.]'s life with him in any year."  She continued, "So I think jumping to a 50/50 is not in his best interest."  She indicated that short, frequent, consistent visits with father "showing up, being involved, talking on the phone daily, calling, those types of things will help and makes more sense."

**{¶36}** On cross-examination, mother was again asked about events that father has attended since the first hearing.  She agreed that father had attended the two events mentioned in her direct examination: the student-teacher conference and the volunteer event.  However, she also agreed that father attended two other events: a "Coding CPU with Kids" event, and a "breakfast with students and parents" event.  When asked why she did not disclose these in her direct exam, she responded, "I don't believe they were intentionally omitted.  I didn't know that she was asking -- I didn't believe that my attorney was asking me to list out every single thing that he's done.  She generally asked and I generally answered that he's attended – he's attended some things since October to January, since we went to trial, and I agree that he has."  She was also asked if she has ever "physically laid [her] hands on dad," and she replied, "I have not."

**{¶37}** At the conclusion of mother's testimony and case presentation, counsel for father indicated that he was calling father to testify.  Mother's counsel indicated this was "fine" so long as the testimony was limited to new information since father already presented his direct testimony.  Father's counsel agreed that it was "just updating."  Nevertheless, the court added that it "would allow testimony in response

to the evidence that's happened since mother testified as well."

{¶38} Father testified that he did not miss any parenting time since the last hearing, except for when mother took J.W. to Florida, which was during one of his scheduled visits. He agreed that he had advance notice of this trip. However, he indicated that he was just told by mother—rather than asked—so "it wasn't like [he] had any say so or could say no, I have something planned." When asked if he was "constantly late" as mother alleged in her testimony, he answered, "Not at all." He testified about his version of the events when he was allegedly late for a session with the tutor and the game. Regarding the tutor, he said he was about three minutes late one time, and he called the tutor in advance to let her know. He indicated that once he got there, he had to call and text the tutor to be let into the building. It was around "ten after" when she finally responded. Regarding the game, he indicated that mother told him to get there for picture day at three, but he got there and nobody was there. He had J.W. with him, and J.W. said he was hungry, so he left to get J.W. something to eat and then came back. He said the game had not started, but "we may not have been there at the time where [mother] wanted us to be there." He agreed that J.W. got his pictures and was in the game. He stated, "I'm not going to sit here and state that I've been perfectly on time. Things come up here and there, where you may be two/three minutes -- I will admit that. That is true." However, he testified that he "definitely will do [his] best to be better at that."

{¶39} Father was asked if mother's testimony that she never laid her hand on him was accurate, and he replied, "That is not accurate. That's very disappointing to hear. It's not easy for me." Mother's counsel objected "to the extent that the question doesn't contain any specific timeframe." Counsel indicated an objection to information or evidence that occurred "prior to the last custody order." The court

overruled the objection, finding the testimony to be in line with its ruling that father was allowed to testify in response to mother's testimony. Father then testified in detail about three events where mother allegedly was physically violent with him, occurring in 2016 and 2017. The last one was when they were living together, and mother was pregnant. This resulted in father "trying to evict" mother. He testified that these altercations "made [him] not want to communicate," and "not want to interact." He said, "I've just been able to get over it recently." He denied that he felt anything like this would happen moving forward and agreed that he felt like he could still coparent with mother. He testified, "I feel like I'll do that in the best interest of my son. I would never tell my son, for example, that she did this to me. I have never said this to my son or anything of that nature, you know." When asked if this experience with mother affects how he thinks mother might discipline J.W., he replied, "It had me concerned. Very much so." He agreed that this was what he expressed to the GAL.

{¶40} Regarding parenting time, he testified that he was asking the court to adopt the GAL's recommendation of a phase-in schedule toward equal parenting time and stated his belief that they could do an equal parenting schedule "very easily" because they live so close together and close to J.W.'s school. When asked if he believed this was in J.W.'s best interest, he agreed that he did and indicated the things he could do with J.W. that he felt J.W. would like to do and things he could teach J.W. that he felt would help him. He also indicated that he could be an upstanding male role model in J.W.'s life. He said, "So I really want to be a -- very important to be a part of my son's life, and that's why I'm here. It means everything to me, and, you know, I want to make sure that it happens."

{¶41} At the conclusion of father's testimony, mother's counsel indicated that she was calling mother in rebuttal, and the court agreed.

**{¶42}** During mother's testimony, her counsel clarified that the objection stood regarding any evidence prior to the last custody hearing. However, since the evidence was allowed, she proceeded to ask mother about the allegations. Mother first expressed her belief that father was just trying to say negative things about her and present a "negative and nasty picture" of her. Then, when addressing the allegedly violent incidents that father testified about, mother said that she believed the trips actually occurred in 2015 or 2016 and indicated that "most of things he said" were not true or accurate. However, she continued to say, "But I will say we did get into altercations, and a lot of times alcohol was involved. And we both were doing things that were -- you know, not proud of, and again don't think they have anything to do with like custody and 50/50 parenting time in the best interest of what [J.W.] has -- what [J.W.] has said he wanted. But, yeah, they -- they -- we did have some situations in those -- in those times." She then attempted to say there was "one thing" father mentioned—regarding a door and his elbow—that she didn't "recall," but did not specifically deny any of the allegations. She just said, "So again I think just a different recollection of events." When she was asked about father's report to the GAL that their relationship ended because mother was unfaithful and physically abusive, mother said, "Well, again it's not true. I was not –I was not unfaithful to him. There was no infidelity on my part, but it's again in line with this whole idea of him being a victim. And I think at the end of the day he's not doing his job. He's not spending time with our child."

### IV. The Juvenile Court's Decision

**{¶43}** The magistrate ultimately entered a decision granting mother's motion to modify on April 22, 2024. In doing so, the magistrate said that mother was "filing for a modification of the allocation of parental rights and responsibilities" as to J.W.

and found that "[n]either parent contests that a change of circumstances has occurred that allows for a discussion of Mother's proposed modification." The magistrate said that the parents held "custody in an arrangement analogous to shared parenting," but found that neither of mother's proposed shared parenting plans actually requested "shared parenting" under R.C. 3109.04(L)(6), as she requested to be the sole residential parent in each proposed plan. Therefore, the magistrate rejected both proposed plans and instead indicated that it would "modify the 02/10/2020 joint custody agreement so far as the facts compel, since the Court is prohibited from fashioning its own shared parenting plan and the earlier agreement is closer in nature to shared parenting than is Mother's proposed plan." The magistrate indicated that the parents "are very near agreement on all matters," but "cannot agree only on the appropriate parenting time division for the Child, and, even more specifically, the regular ongoing parenting time (as opposed to holidays, extended time, etc.)."

**{¶44}** Notably, the magistrate amended section 2 and 3 of the February 10, 2020 order, which are the sections within the incorporated Virginia order—mentioned above—that pertain to "legal custody" and "physical custody." The magistrate amended section 2 to state, "Mother and Father shall continue to have joint custody of the Child herein, but the exception for medical decisions is vacated, that is Mother and Father shall also share medical decision making equally between them. Mother shall be designated the residential parent for school registration purposes only." Thus, the magistrate amended the provision of the Virginia order providing for "joint *legal* custody," to now simply say "joint custody." The magistrate then amended section 3 to solely set forth father's parenting time, which was in the form of the "so-called 2-2-5-5 pattern." Under this pattern, during week one, mother would have J.W. on Monday, Tuesday, Friday, Saturday, and Sunday, while father would have J.W. on

Wednesday and Thursday. During week two, mother would have J.W. on Monday and Tuesday, while father would have J.W. on Wednesday, Thursday, Friday, Saturday, and Sunday.

{¶45} Mother filed objections to the magistrate's decision. First, mother argued that the magistrate's parenting-time determination was against the manifest weight of the evidence and not in J.W.'s best interest as the evidence showed that the "consistent theme" in the case was father's "inconsistency in the child's life, lack of meaningful engagement, and lack of prioritizing the child." Mother asserted that maintaining the interim parenting-time schedule already in place and working up to the "reasonable increase" in parenting time set forth in her amended proposed shared parenting plan was in J.W.'s best interest where such "reasonable increase" provided more frequent and consistent time with father without creating a "dramatic change" for J.W. Second, she argued that the magistrate "erred by allowing testimony and evidence to be admitted that was prior to the last custody order and prior to the child's date of birth and the testimony was mischaracterized in the Decision." This argument was regarding father's "accusations" toward the end of trial that mother was violent during their relationship. Third, she argued that the magistrate "erred when he didn't adopt or order amendments to Mother's Amended Proposed Shared Parenting Plan." She asserted that, if the magistrate "had an issue with the specific wording" of her amended proposed shared parenting plan, he should have ordered an amendment to the plan, not "struck the entire document." Mother later filed supplemental objections, raising the same three objections as well as a fourth objection in which she argued that the magistrate "erred by allowing Father to testify on direct examination on two separate trial dates."

{¶46} After responsive briefing, the juvenile court entered a decision in

September 2024 granting mother's "objection" and setting aside the magistrate's order after finding that the magistrate failed to "properly determine the factual issues and appropriately apply the law." Mother's third objection—regarding the authority of the magistrate to modify/disregard her proposed shared parenting plan—appears to be the basis of the court's rejection of the magistrate's decision. The juvenile court did not explicitly address any of mother's other submitted objections. Thus, the juvenile court did not make any written findings as to the two objections regarding father's testimony in this entry.

{¶47} Regarding the allocation of parental rights and responsibilities, the juvenile court determined that a change in circumstances had occurred (parents relocating and child continuing to age and develop) such that the court was "permitted to consider" modification of the prior decree allocating parental rights and responsibilities. After considering the statutory factors in R.C. 3109.04(F)(1) and (2), the juvenile court found that "shared parenting" was "appropriate." Therefore, in the shared parenting plan, the court ordered that the parties "shall continue to have joint custody of the Child herein."

{¶48} Regarding parenting time, the juvenile court found that it had authority to modify the shared parenting plan under R.C. 3109.04(E)(2)(b) "without requiring the parties to submit a modified proposed shared parenting plan." Acting under such authority and after considering the statutory factors in R.C. 3109.051 and the best interest of J.W., the juvenile court "adopted and approved" mother's August 2023 proposed shared parenting plan, with certain modifications.

{¶49} Relevant here, the juvenile court ordered a phase-in schedule for father's parenting time that resulted in father having equal parenting time on a "2-2-5-5" schedule beginning on "January 6, 2024." Father was also ordered to "engage in

23

all educational, extra-curricular, as well as physical and mental health appointments and commitments, such that the burden is shared equally between the parents."

{¶50} Mother subsequently filed a motion "for reconsideration and/or clarification," raising five issues with the juvenile court's decision. Relevant here, mother sought correction of the typographical error in the parenting-time order, in which the court stated January 2024 rather than January 2025. Further, mother sought "a ruling" on her second and fourth objections regarding father's testimony.

{¶51} The juvenile court issued an order the following day granting the motion. Among other things, the juvenile court overruled mother's second and fourth objections regarding father's testimony, finding that the magistrate did not err in considering testimony related to events that occurred prior to the last custody order and the child's birth where the information was "unknown and unheard by the Court," and did not err in allowing father to testify on direct at the January hearing as the testimony was appropriately limited to new information and responsive testimony. The juvenile court further reissued the relevant parenting-time order to reflect a January 6, 2025 start date for equal parenting time.

{¶52} Mother now appeals from the juvenile court's judgment, raising three assignments of error. First, mother argues that the juvenile court abused its discretion by awarding father significant parenting time that is not in the best interest of J.W. Second, she argues that the juvenile court abused its discretion "by admitting the testimony about events that occurred prior to the last custody order and prior to the child's date of birth as evidenced at trial." Third, she argues that the juvenile court abused its discretion by allowing father to testify on direct examination on two separate trial dates.

## V. First Assignment of Error

### A. Legal Background and Standard of Review

{¶53} Under R.C. 2151.23(F)(1), the juvenile court must exercise its jurisdiction in child-custody matters in accordance with R.C. 3109.04.

{¶54} Under R.C. 3109.04(A), subject to the best interest of the child and the specific statutory circumstances, when allocating parenting rights and responsibilities for the care of a child, a court must ultimately either (1) allocate the parental rights and responsibilities for the care of the child primarily to one parent, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents other rights and responsibilities for the care of the child, including, but not limited to, the responsibility to provide support for the child and the right of the parent who is not the residential parent to have continuing contact with the children; or (2) allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical and legal care of the children in accordance with the approved plan for shared parenting.

{¶55} "'[S]hared parenting' means that the parents share, in the manner set forth in the plan for shared parenting that is approved by the court under division (D)(1) and described in division (L)(6) of this section, all or some of the aspects of physical and legal care of their children." R.C. 3109.04(K).

{¶56} "A shared-parenting decree and a shared-parenting plan are distinct legal instruments under Ohio law, serving different purposes in the context of child custody arrangements." *In re E.M.*, 2025-Ohio-1810, ¶ 11 (2d Dist.). "A shared-parenting decree is a court order that grants parents shared parenting rights and responsibilities for their child, while a shared-parenting plan details the

implementation of that decree, including specific instructions relating to the child's care." *Id.*, citing *Palichat v.Palichat*, 2019-Ohio-1379, ¶ 16 (2d Dist.).

> A plan for shared parenting shall include provisions covering all factors that are relevant to the care of the children, including, but not limited to, provisions covering factors such as physical living arrangements, child support obligations, provisions for the children's medical and dental care, school placement, and the parent with which the children will be physically located during legal holidays, school holidays, and other days of special importance.

R.C. 3109.04(G).

**{¶57}** In the event that either a parent or the trial court finds it necessary to make changes to a shared-parenting decree or plan, "[t]he procedures [under R.C. 3109.04] differ depending on whether the trial court intends to modify a decree that allocates parental rights and responsibilities, modify the terms of a shared-parenting plan, or terminate a shared-parenting decree and plan." *Bruns v. Green*, 2020-Ohio-4787, ¶ 9.

**{¶58}** Once the court issues a decree allocating parenting rights and responsibilities, the court may not modify the decree unless it finds that a sufficient change in circumstances—as indicated in the statute—has occurred and that modification is necessary to serve the best interest of the child. R.C. 3109.04(E)(1)(a); s*ee Bruns* at ¶ 11 ("R.C. 3109.04(E)(1)(a) allows for modifications of a shared-parenting *decree*." (Emphasis in original)). In applying this standard, the court must retain its previous residential-parent designation or prior shared-parenting decree, unless it finds that modification is in the best interest of the child and one of the provisions in R.C. 3109.04(E)(1)(a)(i)-(iii) apply.

26

**{¶59}** On the other hand, modification of a shared-parenting plan does not require a change in circumstances. *See* R.C. 3109.04(E)(2)(a) and (b). Under R.C. 3109.04(E)(2)(b), the trial court may modify the terms of the plan for shared parenting approved by the court and incorporated by it into the shared-parenting decree (1) upon its own motion at any time if the court determines that the modifications are in the best interest of the child, or (2) upon the request of one or both of the parents under the decree, provided that the court may not make any modifications of the plan unless the modification is in the best interest of the child. R.C. 3109.04(E)(2)(b); *see Bruns* at ¶ 11 ("Subsection (E)(2)(b) authorizes a trial court—on its own initiative or at the request of one or both parents—to modify the terms of the shared-parenting plan when modification is found to be in the best interest of the child."). Modifications under R.C. 3109.04(E)(2)(b) may be made at any time. *Id.*

**{¶60}** This court reviews a trial court's modification of a shared-parenting plan under R.C. 3109.04(E)(2)(b) for an abuse of discretion. *Sharif v. Sharif*, 2022-Ohio-2856, ¶ 13 (1st Dist.), citing *Dennis v. Dennis*, 2022-Ohio-1216, ¶ 14 (1st Dist.); *accord, e.g., Cobb v. Ortiz*, 2021-Ohio-2009, ¶ 11 (1st Dist.), citing *Fritsch v. Fritsch*, 2014-Ohio-5357, ¶ 24 (1st Dist.). "An abuse of discretion 'implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion occurs when a court "exercises its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

**{¶61}** This court can hold that the juvenile court abused its discretion regarding best interest where competent, credible evidence does not support the juvenile court's decision. *In re J.M.*, 2022-Ohio-2400, ¶ 10 (1st Dist.), citing *In re E.R.M.*, 2020-Ohio-2806, ¶ 12 (1st Dist.); *Teufel v. Teufel*, 2017-Ohio-5732, ¶ 14 (1st

Dist.), citing *In re D.M.*, 2015-Ohio-3853, ¶ 14 (1st Dist.). However, "[b]ecause the trial judge is in the best position to evaluate the child's best interests, a reviewing court should accord great deference to the decision of the trial judge." *Id*, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 420 (1997).

### *B. Analysis*

**{¶62}** Mother argues that the juvenile court's finding that modification of the parenting time schedule to a "2-2-5-5" schedule was in J.W.'s best interest was "not supported by competent, credible evidence." More specifically, mother argues that the juvenile court's decision to modify the parenting-time schedule was not supported by competent, credible evidence where (1) father did not testify "credibly or consistently" regarding his availability for parenting time or establish that he can manage operating under a "2-2-5-5" schedule without negatively impacting J.W., (2) father has little to no experience being involved in J.W.'s life, let alone in an equal parenting-time capacity, and (3) father's "failures to communicate" with her and coparent with her make an equal parenting time schedule unfeasible."

**{¶63}** First, regarding father's ability to manage the "2-2-5-5" schedule, the trial court acknowledged that father's employment reportedly impacted his availability to spend time with J.W. in the past. Nevertheless, the juvenile court found that, despite these past difficulties, father "contends that he is now able to be more accommodating for the child." This finding is supported by competent, credible evidence in the record. Father testified that he sets his own schedule so, if he knows when he will have J.W., he can set his schedule "around that to make sure [he] has the ability to get [J.W.]." He further testified that his schedule is flexible enough to drop off and pick up J.W. at school. Beyond that, father was specifically asked whether he could "realistically" have an equal parenting schedule, and he agreed that they could

"very easily" now that he lives within 15 minutes of mother and J.W.'s school. So, he expressed that he could get to activities and "do things as necessary."

{¶64} Next, regarding father's history of spending time with J.W., the court acknowledged that J.W. had spent more time at Mother's home. Nevertheless, the court determined that J.W. was "well-adjusted" at both parents' homes and found that father's "participation improved throughout the course of the proceedings." These findings are supported by competent, credible evidence in the record. First, although the GAL expressed in her report that J.W. was "more reserved" at father's home, she acknowledged that this may have been attributable to other people in father's home at the time of her assessment. Additionally, she testified that, in addition to the other people present in father's home, she was meeting with J.W. for the first time at father's home, so this assessment was done was she was a "stranger" to J.W. On the other hand, she was not a "stranger" during the assessment at mother's home, and J.W. had neighborhood friends over during her assessment at mother's home, so J.W. was funny and happy at the time. She ultimately denied having any concerns for J.W. at either parent's home. She testified that "both parents are more than appropriate," and said this was ultimately a situation involving "two parents that are very capable and doing very well, and have the child's best interest at heart." Further, although acknowledging a concern that father did not take every opportunity to visit with J.W. in the past, she ultimately said it was not a "major concern." She said that J.W. loves his dad and wants to visit with him, to the extent that he is comfortable. She said that it would make a "huge difference" if father became more involved and went to J.W.'s activities. At the second hearing, father testified that he did not miss any parenting time since the last hearing, and mother agreed that father had attended four school events since the first hearing. Beyond that, when father was asked if he would continue

29

to become more involved in J.W.'s life, father testified,

> There will be no regression whatsoever. There will be no regression. You know, I look forward. It's very enjoyable. We have fun together.
>
> You know, I look forward -- I have trips already planned for this year. I've already planned – February 7th is a Father's Day event.
>
> I already planned to go back to school. They send these messages out for volunteering. I'm already volunteering whenever they need anything.
>
> You know, if – if –whatever – whatever happens I want to be there. I want to be there.
>
> I'm making plans for his spring break, for my spring break. I'm making plans for summer break.
>
> I'm planning in advance, doing whatever. We just got back – it was his birthday.
>
> He was just at Great Wolf Lodge with me this past weekend for his birthday. We planned a birthday trip. His family came down. His cousins came down.
>
> I planned that. We were all at the Great Wolf Lodge together as a family. So for – for me, I'm – I'm all the way in. I'm trying to be.

**{¶65}** Lastly, regarding the ability of the parents to communicate, the juvenile court—when determining whether shared parenting was in J.W.'s best interest—acknowledged that concerns existed about the ability of the parents to cooperate with each other and communicate effectively. Nevertheless, the juvenile court found that each parent has separately expressed a desire to cooperate with the other and make

decisions that are in the best interest of J.W. Mother appears to challenge the court's finding as to father and argues that father admitted that his communications with mother were contingent on his state of mind and said that he does not talk to mother outside of exchanging J.W. However, father expressed this at the first hearing in the context of discussing his history with mother and his exercise of parenting time in the past. Ultimately, when asked if he was willing to communicate with mother, he testified that he wants to do what is in the best interest of J.W. He said, "So if that includes communicating with [mother] frequently, daily, monthly, whatever it takes, I am willing to do that." He even testified that mother sat with him recently at one of J.W's basketball games and said he "thought that was a step in the right direction." He expressed, "It was what I would like to see." He said that it was almost like "typical mother/father" coparenting where mother walked up and asked if she was able to sit with him and he said, "By all means." He testified, "I'm not trying to harbor ill will toward [mother]. I want to move forward in a productive way for – for my son and for our son and what's best for him. You know, so I – I hope that the communication can improve, but I'm willing to do whatever it takes for that to take place."

{¶66} Based on the foregoing, we overrule mother's first assignment of error as the findings of the juvenile court challenged by mother are supported by competent, credible evidence.

## VI. Second Assignment of Error

{¶67} In the second assignment of error, mother argues that the trial court abused its discretion by admitting testimony at trial regarding events which occurred prior to the last custody order and prior to the child's birth. More specially, she challenges the trial court's admission of father's testimony that she was violent during their relationship, prior to J.W.'s birth, and to her family.

31

**{¶68}** "A trial court maintains broad discretion as to the admission and exclusion of evidence, and we review challenges to a court's admission of evidence for both an abuse of discretion and proof of material prejudice." *Edelstein v. Edelstein*, 2025-Ohio-1514, ¶ 49 (1st Dist.).

**{¶69}** Mother first argues that the testimony regarding her alleged prior violence was not relevant to the current custody proceedings and was therefore not admissible under Evid.R. 401.[2] In support of her argument, she points to *Eitutis v. Eitutis*, 2011-Ohio-2838 (11th Dist.).

**{¶70}** In *Eitutis*, the court affirmed the trial court's exclusion of testimony in a hearing regarding modification of parental rights related to sexual abuse that may have occurred during mother's childhood where the information was known prior to the initial decree and information related to the sexual abuse had not arisen since the prior decree, making the information "irrelevant to the current proceedings." *Id.* at ¶ 113.

**{¶71}** Here, while the information concerning mother's alleged prior violence was known prior to the initial decree, the information has arisen since the initial decree and is relevant to the current proceedings where father offered this information to explain his reason for avoiding communication and interactions with mother since the initial decree and to offer background as to why he became concerned that mother might be hitting J.W. as a form of punishment. One of the predominant issues at trial was father's failure to see J.W. as often as he could have in the past, including the use of his past holiday time. Mother's past violence was first mentioned when father was

---

[2] Evid.R. 401 provides that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

offering a rationale for why he missed spending past Christmas holidays with J.W. He expressed "trepidation" communicating with mother because of the past violence. Therefore, the issue of mother's past violence was relevant to the current proceedings insofar as the issue was offered as a justification for father's behavior since the initial decree. Further, father's testimony about the precise occurrences of violence was offered in response to mother's denial that she ever physically laid hands on father. Beyond that, father was questioned by mother's counsel about his assertions to the GAL that mother was violent toward J.W. and her family. Thus, mother's counsel was the one who raised the issue of mother's alleged violence toward her family.

**{¶72}** Mother additionally argues that the testimony was inadmissible under Evid.R. 403(A). However, mother only makes the conclusory assertion that "any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the trier of fact." She does not set forth the reasons in support of her contention or cite to any authority in support of this contention. *See Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.). "It is not the job of this court to develop or root through the record and relevant authorities to find support for a party's proposition." *Id.*

**{¶73}** Mother further argues that the testimony was inadmissible under 404(B) and 608(B). However, mother never objected to the testimony on any of these bases at the hearing and did not raise these arguments in her objections to the magistrate's decision. *See* Juv.R. 40(D)(3)(b)(ii) ("An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection."). Further, she has failed to advance a plain-error argument. *See* Juv.R. 40(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless that party has objected

33

to that finding or conclusion as required by Juv.R. 40(D)(3)(b).”).   Therefore, we decline to reach the merits of this argument.  *See, e.g., In re G.W.*, 2024-Ohio-1551, ¶ 24 (1st Dist.).

**{¶74}** Lastly, mother appears to argue that the magistrate erred in finding that mother admitted to the prior violence as such a finding was not supported by the evidence.   However, the juvenile court did not adopt the magistrate’s decision. Further, when asked about father’s specific allegations of violence, mother did admit that “altercations” occurred.  Therefore, such a finding was supported by the evidence.

**{¶75}** For all the foregoing reasons, we overrule mother’s second assignment of error.

### VII. Third Assignment of Error

**{¶76}** In the third assignment of error, mother challenges the court’s allowance of father’s direct testimony at the second hearing.  She asserts that, in allowing such testimony, the juvenile court abused its discretion under Evid.R. 611(A) by permitting the parties to testify in an order that was not “effective for the ascertainment of the truth,” and subjected her to harassment and undue embarrassment.

**{¶77}** Under Evid.R. 611(A), “The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.”

**{¶78}** “Generally, the manner and mode of the presentation of a trial is within the court’s discretion and will not be disturbed absent an abuse of that discretion.” *Harris v. City of Cincinnati*, 1997 Ohio App. LEXIS 4540, *8 (1st Dist. Oct. 10, 1997).

**{¶79}** As an initial matter, mother never specifically raised an objection based on Evid.R. 611(A) at trial or in her objections to the magistrate's decision. Nevertheless, she did assert in her objections to the magistrate's decision that father was given an "unfair advantage" at trial by being allowed to testify on direct twice. Therefore, this argument will be addressed to the extent that it argues that father was given an unfair advantage.

**{¶80}** It should first be noted that mother started the irregular order of interrogation or presentation of evidence by calling father on cross-examination at the very start of her case presentation. It was during this cross-examination that mother's counsel first elicited testimony from father about mother's alleged prior violence. At the conclusion of father's cross-examination, the court gave father the option of "how to handle direct." Father's counsel chose to proceed with direct examination at that time. At the conclusion of father's direct testimony, he was subjected to re-cross by mother's counsel. Then, mother continued her case presentation by presenting the testimony of the GAL and then herself. Notably, during her cross-examination, she directly denied ever physically laying hands on father.

**{¶81}** At the conclusion of mother's testimony, father began his case presentation by indicating he would again present his own testimony. Mother's counsel pointed out that father did direct "last time," but did not specifically object. Rather, father's counsel indicated that it would just be for "an update" since the last time, to which mother's counsel indicated agreement so long as the testimony was limited to new information. However, the court added, "And I would allow testimony in response to the evidence that's happened since mother testified as well." Mother did not object to this ruling. Father proceeded to testify. During this testimony, he spoke about the specific incidences of violence regarding mother in response to her

assertion during her cross-examination that she never physically laid hands on father. Thus, this testimony was in line with the court's ruling that father could present evidence in response to mother's testimony, and mother did not challenge the court's ruling in this regard. Beyond that, mother does not specifically challenge on appeal any of father's other testimony as beyond the scope of what was either agreed to or ruled upon as permissible by the court. Notably, after father's additional testimony, he was subjected to cross-examination by mother, the GAL, and then mother again based on father's responses to the GAL's questions. Further, mother was permitted to present additional testimony in rebuttal. During this testimony, mother was able to testify in response to father's assertion of the specific instances of violence.

{¶82} Nothing about this mode and/or order of interrogating witnesses and presenting evidence indicates that father was given any sort of unfair advantage. Mother was permitted to cross-examine father on all his direct evidence, and she was permitted to testify in rebuttal to all of father's testimony and have the last word. If anything, father would have been denied a fair opportunity to respond to mother's testimony had the court not permitted him to present further testimony at the start of his case presentation.

{¶83} Mother asserts that the procedure at trial was not "effective for the ascertainment of the truth." However, the opposite appears to be true as each party was given a fair opportunity to present their own testimony and/or evidence and fair opportunity to respond to the other party, with mother ultimately having the last word.

{¶84} She further asserts that she was subjected to harassment and undue embarrassment. However, the record does not reflect any harassment of mother and, while she may have felt embarrassed by father's testimony, there is no indication that the embarrassment was "undue."

36

**{¶85}** For all these reasons, we overrule the third assignment of error.

### *VIII. Conclusion*

**{¶86}** We overrule the first assignment of error where the juvenile court adopted mother's proposed shared parenting plan with certain modifications "to support the best interest of the Child" under R.C. 3109.04(E)(2)(b), and the juvenile court's findings regarding J.W.'s adjustment to father's home, father's ability to accommodate a "2-2-5-5" schedule, father's increased participation in J.W.'s life during the pendency of the proceedings, and father's willingness to communicate with mother were all supported by competent, credible evidence. Additionally, we overrule the second and third assignments of error where the juvenile did not abuse its discretion in admitting evidence of mother's prior violence or by allowing father to further testify on direct in response to mother's testimony and to present new information. Therefore, we affirm the judgment of the juvenile court.

Judgment affirmed.

**MOORE, J.,** concurs.
**KINSLEY, P.J.,** concurs in judgment only.